U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 JUL 30 PM 2:07

CLERK
BY ESB
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOHN G. F. RUGGIERI-LAM and MARIA )
L. FREDURRA, )
 )
   Plaintiffs, )
 )
   v. )    Case No. 5:15-cv-144
 )
OLIVER BLOCK, LLC, )
 )
   Defendant. )

**OPINION AND ORDER RE:**
**PLAINTIFFS' PETITION FOR WRIT OF ATTACHMENT**
**(Doc. 2)**

     Plaintiffs John Ruggieri-Lam and Maria L. Fredurra brought this action against defendant Oliver Block, LLC ("Oliver Block") arising from negotiations for the sale of defendant's commercial building in Woodstock, Vermont. Plaintiffs allege that Oliver Block breached a contract to sell the property to them and breached the covenant of good faith and fair dealing. (Doc. 1.) Plaintiffs seek specific performance. Plaintiffs filed this petition for a writ of attachment on Oliver Block's property, asserting a likelihood of obtaining a judgment on their breach-of-contract claim.

    **I.**    **Facts**

     The following facts are drawn from the verified complaint; the parties' motions and exhibits; and the testimony at the hearing on July 29, 2015. The facts are based upon the evidence submitted up to and including the hearing and do not constitute final factual determinations.

     Plaintiffs are principals of Stonewall of Woodstock Corp. ("Stonewall"), a corporation which runs Bentleys, a restaurant in Woodstock. Stonewall leases space in the French-Cabot building located on Elm Street. The French-Cabot building is owned by Oliver Block, a Vermont company whose sole member and owner is Dr. Richard Coburn of New York City. Dr.

1

Coburn is the principal in entities which own two other properties in the Woodstock area. These include a building in Quechee not relevant here as well as the Morgan Block building which is located two doors away from the French-Cabot building.

From the beginning of their tenancy approximately two years ago, plaintiffs expressed interest in purchasing the French-Cabot building, but Dr. Coburn had never been willing to sell it. On April 1, 2015, Dr. Coburn sent a fax to Mr. Ruggieri-Lam, commenting on the cover page: "Promised Purchase Proposal" and "No April Fool." (Doc. 1-1 at 1.) The fax appears as an exhibit to plaintiffs' complaint. Aside from the cover page, it is a one-page document titled "French Cabot" which includes purchase price and terms; the building's monthly rental income; and the annual taxes and insurance costs. (*Id.* at 2.)

On the same date, Dr. Coburn sent similar solicitations to other potential purchasers whom he believed might be interested in purchasing the property. Other fax recipients were also invited to purchase Dr. Coburn's other Woodstock properties. These took the same form of a sheet of proposed terms of sale and information about the properties. Dr. Coburn did not tell plaintiffs until June 2015 that he was offering the French-Cabot building to other buyers.

The fax from Dr. Coburn to plaintiffs prompted phone and email negotiations between the parties. During the month of April 2015, plaintiffs investigated the cost of repairing the French-Cabot building. On May 11, 2015, Mr. Ruggieri-Lam sent an email to Richard Sbeglia, Dr. Coburn's assistant, in which he wrote: "Maria and I plan on having a counter to doctor Coburn by this week's end. . . . We are making a determination if an offer on Morgan is feasible and/or desirable to us overall in any event." (Doc. 7-5.) On May 14, Mr. Sbeglia sent Mr. Ruggieri-Lam an email with the subject: "Will we get a proposal from you this week?" (Doc. 7-6 at 1.) Mr. Ruggieri-Lam responded three minutes later: "Yes, I am hoping to get it to you tomorrow." (*Id.*) In late May in a telephone call with Dr. Coburn, plaintiffs offered to buy the French-Cabot building for $1,425,000 with seller financing and $25,000 down.

In response to plaintiffs' offer, Dr. Coburn asked his Vermont attorney Frank Urso to prepare a purchase and sale agreement. The plaintiffs reviewed the first draft they received from Mr. Urso and requested a few revisions.

On June 2, 2015 Mr. Urso sent plaintiffs an unsigned purchase and sale agreement as an email attachment. In the email which accompanied the agreement, Mr. Urso wrote:

Attached you will find:

1. A revised Agreement with changes shown; and
2. A revised Agreement (clean copy) for execution along with Exhibit A

Please execute and get copies back to me while mailing me the deposit check.

Frank.

The Agreement listed the parties as seller and purchaser and set forth a purchase price of $1,425,000 for the French-Cabot building; a $25,000 deposit to be paid "[u]pon the execution and delivery of the Agreement"; and mortgage financing terms. (*Id.* at 1.) The Agreement contained signature blocks for the parties on the last page, and was unsigned.

Plaintiffs signed the Agreement on June 2, 2015 and returned it to Mr. Urso, along with a $25,000 deposit check. (*Id.* at 6; Doc. 1-4.) On June 3, 2015, Mr. Urso emailed Mr. Ruggieri-Lam: "I have received the signed agreement and the deposit check for $25000." (Doc. 1-5.) Mr. Urso deposited plaintiffs' check in his law firm's trust account. Neither Dr. Coburn nor anyone acting as his agent or representative ever signed the Agreement on behalf of Oliver Block.

Plaintiffs requested on multiple occasions via email that Dr. Coburn sign the Agreement and that a copy of the Agreement, signed by both parties, be circulated. (Doc. 7-12 at 1; doc. 7-13; doc. 7-14 at 1-3.) Mr. Ruggieri-Lam testified that he did so not because he believed Dr. Coburn's signature was legally necessary, but because he knew it would make the closing process go more smoothly. According to Mr. Ruggieri-Lam, he had a "done deal" with Oliver Block upon signing the Agreement and mailing the deposit check.

What plaintiffs did not know was that Dr. Coburn was negotiating simultaneously with other prospective purchasers. Ken Sturm, a restaurant owner from New York City who also owns a restaurant in Woodstock, expressed interest in buying both the French-Cabot building and the Morgan Block. On June 3, 2015, Mr. Sbeglia advised Mr. Sturm of plaintiffs' offer to buy the French-Cabot building and gave Mr. Sturm forty-eight hours to make a better offer. In response, Mr. Sturm offered to buy both buildings. He supplied a deposit check for $50,000 which Mr. Urso also deposited in his firm's trust account.

3

On June 11, 2015, Mr. Sbeglia sent Mr. Ruggieri-Lam an email stating: "Dr. Coburn has come to a decision. He must sell *both* French Cabot and Morgan Blocks under the following terms." (Doc. 7-10.) The terms included a $1,640,000 purchase price for the French-Cabot building and $800,000 for the Morgan Block. The terms also called for a down payment of $50,000 and 6% interest rates. (*Id.*) The email concluded: "I understand that these numbers may be out of your ballpark and I regret that. Unfortunately, we have no choice. We are sending the above to other parties who have expressed an interest in the buildings. If you can do this, let me know immediately. . . ." (*Id.*)

Plaintiffs and Dr. Coburn met for further negotiations on June 15, 2015. (Doc. 7-1 at 5; doc. 7-10.) Dr. Coburn informed plaintiffs that he had an offer from another prospective purchaser that met his requirements and that he would give them an opportunity to do the same. Dr. Coburn stated that plaintiffs agreed to review the terms and get back to him shortly. (Doc. 7-1 at 5.)

During the meeting plaintiffs requested a key to access the "wedge," a portion of the French-Cabot building in which they wanted to temporarily house an employee who needed a place to stay. Dr. Coburn gave them a key. He testified that he offered the wedge as well as a room in another Woodstock property to temporarily house the employee and that plaintiffs chose the wedge. Plaintiffs "began to clean" the wedge in preparation for short-term use by their employee. (Doc. 12 at 10.)

On the same day, June 15, Mr. Ruggieri-Lam sent Mr. Urso an email stating: "Maria and I are amenable to revising our terms . . . . We are amenable to a purchase deal as follows." (Doc. 7-14 at 6.) The email lists a purchase price of $1,640,000 for the French Cabot building and $800,000 for the Morgan Block, with interest rates of 5.25% and 4.75% for the respective buildings.

Dr. Coburn decided to sell the buildings to Mr. Sturm's company whose revised agreement provided for the same purchase prices but higher initial principal payments and higher interest rates. (Doc. 7-9.)

On June 16, 2015, Mr. Ruggieri-Lam sent Mr. Sbeglia a lengthy email expressing a concern that "something is afoot with our real estate dealings." (Doc. 1-6 at 1.) He reviewed past kindnesses he had extended to Dr. Coburn, and wrote:

4

> Recently, we st[r]uck a firm deal for the Woodstock Property sale. Now, we have been asked . . . to swallow the bitter pill of Morgan and increased compensation for the buildings sales. In the long term interests of the business and our dedicated employees, we stepped up—substantially—yet again. . . . To pass us over, in violation of our agreement for another party with perhaps deeper pockets, would be wrong. We are ready, willing and able to move forward as we planned.

(*Id.* at 2.) Mr. Sbeglia's response, sent less than two hours later, included:

> I don't agree with your assessment of the path taken to this point. . . . Before any contracts were consummated, Dr. Coburn gave you an opportunity to match an offer that substantially resolved some major problems he was facing in getting clear title to the properties. . . . I believe we were extremely generous in giving you and Maria the opportunity we did.

(*Id.* at 1.) On June 22, 2015, Mr. Urso returned plaintiffs' deposit. (Doc. 7-15.) On June 23, 2015, plaintiffs filed this action, alleging anticipatory breach of contract and breach of the covenant of good faith and fair dealing. (Doc. 1.) Plaintiffs request specific performance of the Agreement they signed.

## II. Writ of Attachment Standard

Rule 64 of the Federal Rules of Civil Procedure makes available to federal court litigants the prejudgment remedies available in the state where the federal court is located. Rule 4.1 of the Vermont Rules of Civil Procedure allows for the attachment of a party's real estate "to satisfy any judgment for damages and costs which the plaintiff may recover." V.R.C.P. 4.1(a). An order of attachment will only issue upon:

> a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance, bond, or other security shown by the defendant to be available to satisfy the judgment.

*Id.* 4.1(b)(2); *see also Vt. Fed. Credit Union v. Richter*, No. 2013-354, 2014 WL 3714629, at *2 (Vt. Feb. 20, 2014). The plaintiff bears the burden of demonstrating a "reasonable likelihood" that he or she will win at trial. *Wellford v. Eissmann*, No. 747-10-09 Wrcv, 2010 Vt. Super. LEXIS 28, *3 (Vt. Super. Ct. Mar. 9, 2010). "The finding of a 'reasonable likelihood' of success on the merits is 'intended to be a realistic conclusion by the court on the basis of affidavits and other evidence presented at the hearing as to the actual probability of recovery by the plaintiff.'" *Id.* (quoting V.R.C.P. 4.1, Reporter's Notes—1973 Amendment). "[C]onsistent with the view

5

that prejudgment writs of attachment are extraordinary remedies," the court also considers defenses and modifying evidence presented by the defendant. *Id.* at *3-4 (citing *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 332 (2d Cir. 1983)).

### III. Analysis

Oliver Block argues that plaintiffs have not shown a reasonable likelihood of succeeding on the merits because they cannot show compliance with Vermont's statute of frauds and because the parties never entered into a contract.

> Vermont's statute of frauds provides:
>
> An action at law shall not be brought in the following cases unless the promise, contract, or agreement upon which such action is brought or some memorandum or note thereof is in writing, signed by the party to be charged therewith or by some person thereunto by him or her lawfully authorized: . . . (5) A contract for the sale of lands, tenements, or hereditaments, or of an interest in or concerning them. Authorization to execute such a contract on behalf of another shall be in writing.

12 V.S.A. § 181. The purposes of the statute of frauds include lending gravity to land transactions and "protect[ing] land transactions from oral and perhaps false testimony." *Mahoney v. Howe*, No. S0890-02 CnC, 2004 Vt. Super. LEXIS 44, *4-5 (Vt. Super. Ct. May 4, 2004) (citing *Chomicky v. Buttolph*, 513 A.2d 1174 (Vt. 1986) and *Mason v. Anderson*, 499 A.2d 783 (Vt. 1982)). Although the contract need not "enumerate every detail of the agreement in writing," it must contain "signatures, identification of the parties, a description of the property, and the price." *Id.* at *5.

Plaintiffs argue that the Agreement complies with the statute of frauds because Mr. Urso's June 2 email which included the attachment of the Agreement constituted a signed, written offer, which they accepted. The court disagrees. The absence of an agreement signed by Dr. Coburn on behalf of Oliver Block or by a representative of the company acting upon written authority is likely to prove to be fatal to plaintiffs' claim. Those cases which limit the effect of the statute of frauds in certain respects do not go so far as to eliminate the fundamental requirement that contracts for the sale of realty must be signed by the person against whom the contract is offered or by a representative whose authority appears in writing.
6

This case could serve as an exemplar of the type of misunderstanding which the statute of frauds was intended to eliminate. The exchange of term sheets followed by unsigned draft contracts is common practice in the sale of land and buildings. Both parties remain free to negotiate—often in great detail over many issues—without being bound by their proposals and counter-proposals until they sign. In contrast to the sale of goods, an unsigned offer to sell real estate is generally unenforceable. *See* 9A V.S.A. § 2-201 (listing conditions under which the parties may be bound in the absence of a signed writing).

Plaintiffs have expressed several reasons why they may enforce the Agreement against Dr. Coburn and Oliver Block. These may be summarized as:

(1) the email to which the Agreement is attached is signed by Mr. Urso as attorney for seller, thereby satisfying the statute of frauds;

(2) the genuineness of the Agreement is established by various signs and marks on the document which amount to a signature;

(3) the statute of frauds does not apply to parties who have prepared a written contract which they forwarded unsigned to the party now seeking to enforce it; and

(4) the statute of frauds is limited to cases in which a party is at risk of being compelled to perform by oral testimony only.

The court starts with the argument that Oliver Block's attorney, Mr. Urso, bound the defendant to the terms of the Agreement when he forwarded it. The court separates the issue of contract formation from the requirements of the statute of frauds. Focusing exclusively on the statute of frauds issue, the court notes that it is true—as plaintiffs observe—that:

> The statute of frauds does not require the memorandum to be in one document. It may be pieced together out of separate writings, . . . and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed.

*Babdo Sales, Inc. v. Miller-Wohl Co.*, 440 F.2d 962, 966 (2d Cir. 1971) (applying New York law). *But see Towsley v. Champlain Oil Co.*, 254 A.2d 440, 441 (Vt. 1969) (noting with approval that plaintiff's only recourse in the lower court had been to show that "equitable considerations justified taking the contract out from under the Statute of Frauds" where contract for the sale of land was prepared by defendant, signed by plaintiff, and never signed by defendant).

The statute of frauds anticipates a written contract signed by both parties. The primary exception to the expectation of two signatures arises from the language of the statute which requires only a writing "signed by the party to be charged therewith." Subject to the substantive requirements of offer, acceptance, and consideration, a written contract may be enforced against a party who has signed it even if the other has not. *See First Nat. Bank of St. Johnsbury v. Laperle*, 86 A.2d 635, 638 (Vt. 1952) (holding that "a written offer accepted by parol may constitute a sufficient memorandum of the contract, provided the person making the offer is the party to be charged"); Restatement (2d) of Contracts § 131 (1981) ("[A] contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which . . . [*inter alia,*] is sufficient to indicate that a contract with respect thereto has been made between the parties *or offered by the signer to the other party.*") (emphasis added).

What the Vermont cases have never questioned is that the offer setting out the terms of the contract must be in writing and that it must be signed by the party opposing enforcement or by that party's representative acting on written authority. Here, the June 2 email specifically referenced the Agreement attached to it, which contained all the necessary terms. The email was signed electronically by "Frank" Urso, and an electronic signature suffices for statute of frauds purposes. 9 V.S.A. § 276. However, there is no evidence in the record that Dr. Coburn gave written authorization to his lawyer to make offers to sell Oliver Block's land.

The statute of frauds requires that authorization to execute a contract on behalf of another be in writing. "Both the fact of signature and evidence of the authority of an agent to sign have been held essential in [Vermont] law." *Pike Indus., Inc. v. Middlebury Assocs.*, 398 A.2d 280, 282 (Vt. 1979); *see also Couture v. Lowery*, 168 A.2d 295, 298 (Vt. 1961) ("In order to hold the defendants to specific performance of the agreement to convey, they must either have personally signed a written agreement to sell the farm, or have duly authorized in writing an agent to sign for them. No such writing appears.").

Plaintiffs argue that written authorization to sell real property on behalf of the seller is not required where the fact of the agency relationship is undisputed by either party. However, they cite no supporting case law for this proposition, which is contrary to the case law cited above holding the written evidence of authority to sell real property "essential" under the statute of

8

frauds. *Pike Indus., Inc.*, 398 A.2d at 282. The case plaintiffs cite, *Right Printing Co., Inc. v. Stevens*, 179 A. 209 (Vt. 1935), stands for the proposition that a lawyer may bind his or her client to contracts in the same way that an agent may bind his or her principal. *Id.* at 212. This case does not hold that an agreement reached by an attorney on behalf of his client is exempt from the requirements set forth in the statute of frauds.

Because plaintiffs can point to no writing by Dr. Coburn authorizing Mr. Urso to offer to sell the French-Cabot building on behalf of Oliver Block, Mr. Urso's email bearing his electronic signature does not qualify as a signature for purposes of the statute of frauds.

The court turns next to the argument that other marks and writings within the Agreement establish its authenticity and take it out of the requirements of the statute of frauds. But there is no question in this case about authenticity or of fraud in the common law sense of deceit. No one contends that the Agreement was fabricated in some respect. The only claim by defendant is that it was not sufficiently formalized by way of a signature. The statute of frauds serves both to prevent deception and to establish a bright-line rule for determining when certain contracts become enforceable. The requirement of a signature serves both purposes. Unsigned offers and counteroffers may be exchanged freely, but upon signing, the document will bind the parties. Having ruled out the signature of "Frank" on the covering email as the source of a valid signature due to the lack of written authority, there are no other marks or initials on the Agreement which can serve as an alternative signature.

The argument that the statute of frauds does not apply to an unsigned agreement forwarded to the other side is unsupported by Vermont case law. There are exceptions to the signature requirement. The principal one already discussed is that the party receiving an agreement which has been signed by the other side may bind that party by oral agreement or some other parol manifestation of assent, but the case standing for that principle, *First Nat'l Bank of St. Johnsbury v. Laperle*, 86 A.2d 635 (Vt. 1952), does not go so far as to relieve both parties of any obligation to sign. It is the party against whom enforcement is sought who must sign and that signature is not present in this case.

Finally, there is no support in the case law for plaintiffs' argument that the statute of frauds is limited to cases in which the only basis for binding one party is oral testimony. The

9

language of the statute anticipates the problem presented by this case in which there may be a written contract transmitted by a representative or agent. (Mr. Urso and Dr. Coburn deny that Mr. Urso was ever authorized to enter into a contract on behalf of Oliver Block. The court does not reach the issue of whether Mr. Urso had actual or apparent authority because it does not reach the question of contract formation.) The requirement that the agent's authority to sign a contract or offer must itself be in writing arises principally when there is some agreement in writing to sign. The presence of an unsigned writing does not take this case out of the statute of frauds. The two critical requirements of a writing and a signature are independent requirements within the statute, and the presence of one does not relieve the plaintiffs of proving the other.

The operation of the statute of frauds in this case is neither remarkable nor unfair. Both sides are highly experienced real estate investors and business operators. Two of the principals—one on each side—are attorneys. The evidence produced to date demonstrates that the defendant sought to "play the field" by collecting as many offers as it could from potential buyers without committing in writing to any one suitor. When it did choose a buyer, it did not choose plaintiffs who are unable to produce an agreement to sell the property which meets the minimum level of formality—a signature from the seller—which lies at the heart of the statute of frauds.

In short, plaintiffs have not been able to establish a basis for avoiding the effect of the statute of frauds. Since the statute of frauds is a sufficient defense to plaintiffs' claim, the court does not reach the second issue whether the communications among the parties satisfies the separate requirements for offer and acceptance under principles of contract formation.

Plaintiffs request that the court consider their "efforts in 'the wedge'" in rendering its decision. (Doc. 13 at 10.)

> A contract for the transfer of an interest in land may be specifically enforced notwithstanding failure to comply with the Statute of Frauds if it is established that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement.

Restatement (2d) of Contracts § 129 (1981). Even were plaintiffs to show that an agreement to convey had been reached, they could not show "that acts of [theirs], done in reliance on the agreement, known to the defendant, so altered the relations of the parties as to prevent restoration

10

to their former condition." *Nichols v. Nichols*, 427 A.2d 374, 377 (Vt. 1981) (quoting *Towsley*, 254 A.2d at 442). Plaintiffs' deposit was returned to them three weeks after they tendered it, and plaintiffs' cleaning the room in the wedge does not amount to the level of possession or improvements that would justify specific performance of a contract to convey. *See In re Estate of Gordon*, 706 A.2d 947, 950-51 (Vt. 1997) (holding that possession coupled with "substantial repairs and capital improvements" to home over a period of months could justify specific performance of oral contract to convey real property).

Because plaintiffs have not shown a likelihood of succeeding on the merits, their petition for a writ of attachment is denied.

## IV.   Conclusion

For the reasons stated above, plaintiffs' petition for a writ attachment on Oliver Block's real property is DENIED.

Dated at Rutland, in the District of Vermont, this 30th day of July, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court